HMO-W INCORPORATED, a Wisconsin corporation, Plaintiff-Respondent,†

v.

SSM HEALTH CARE SYSTEM, a foreign corporation, Defendant-Appellant,††

NEILLSVILLE CLINIC, S.C., a Wisconsin corporation, Defendant.

Court of Appeals

*No. 98–2834. Submitted on briefs May 6, 1999.—Decided June 17, 1999.*

(Also reported in 598 N.W.2d 577.)

†Petition to review granted.
††Petition to cross review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Peter B. Ritz* of *Ritz & Caflisch, S.C.,* and *Earl H. Munson* and *Jeffrey J. Kassel* of *LaFollette Sinykin, LLP* of Madison.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Thomas M. Pyper* and *Theresa M. Hottenroth* of *Whyte Hirschboeck Dudek, S. C.,* of Madison, and *Elizabeth Bartlett* of *Blue Cross & Blue Shield United of Wisconsin* of Milwaukee.

Before Dykman, P.J., Eich and Deininger, JJ.

DYKMAN, P.J.    SSM Health Care System (SSM), a minority shareholder of HMO-W Incorporated (HMO-W), appeals from a judgment in which the circuit court applied a minority discount when it appraised the fair value of SSM's shares of HMO-W stock prior to HMO-W's merger with United Wisconsin Services (UWS). The primary issue is whether a circuit court may apply a minority discount when appraising the "fair value" of a dissenter's shares under § 180.1330, STATS. We conclude that such a discount violates the primary purpose of the dissenters' rights statute, which is to protect minority shareholders. We therefore reverse and remand.

SSM also appeals from an order rejecting its argument that HMO-W breached its fiduciary duty when it appraised the corporation's net value for the purposes of paying SSM the fair value of its shares under § 180.1325, STATS., to be less than the valuation it provided to shareholders before they voted on the merger. We reject SSM's argument because it has not established how HMO-W's conduct caused it harm. We

817

therefore affirm the order. Accordingly, we affirm in part, and reverse in part, with instructions to award SSM its pro rata share of HMO-W's pre-merger net assets.

## BACKGROUND

In 1983, a number of hospitals and physicians formed HMO-W as a provider-owned health care system. Two of SSM's subsidiaries, St. Mary's Hospital Medical Center in Madison and St. Clare's Hospital in Baraboo, owned shares of HMO-W stock. The Neillsville Clinic, another investor, also owned shares. These combined shares accounted for slightly less than twenty percent of HMO-W's outstanding shares.

In 1994, HMO-W signed a letter of intent with UWS regarding a "joint venture." HMO-W's management then commissioned Valuation Research Corporation (V.R.) to conduct a valuation study of HMO-W's net assets. HMO-W's management accepted V.R.'s final valuation report, which estimated HMO-W's net value to be between $16.5 and $18 million.

HMO-W's board of directors met to discuss the valuation report as well as the proposed merger with UWS. The board voted to approve the proposed merger and to place it before the shareholders for a vote. The following day, HMO-W sent a packet of proxy materials, including V.R.'s valuation report, to its shareholders for their consideration at an upcoming shareholder's meeting. The materials also informed the shareholders of their dissenters' rights.

At the shareholders meeting, SSM and Neillsville Clinic voted against the proposed merger with UWS. Despite their opposition, the merger was approved. Following the vote, HMO-W sent a letter to its shareholders, pursuant to § 180.1322, STATS., notifying them

of the steps they needed to take to perfect a demand for payment under the dissenters' rights statute. SSM and Neillsville Clinic each took the necessary steps under § 180.1323, STATS., to perfect their demands.

HMO-W hired a firm to value its assets as of a month before the shareholders approved the merger. That firm determined HMO-W's net value to be $7,357,758. Based on this valuation, HMO-W sent SSM a letter, stating that it estimated the "fair value" of its shares to be approximately $475.92 per share, and a check for $1,456,348.48 for SSM's shares. A month later, SSM informed HMO-W that it disputed the appraised fair value of its shares and argued that its own experts calculated the "fair value" of SSM's shares to be $4,753,050.

Pursuant to § 180.1330(1), STATS., HMO-W brought a special proceeding in Sauk County Circuit Court to determine the fair value of the shares. In its answer, SSM argued that HMO-W was estopped from claiming a fair value less than the appraised value of $16.5 to 18 million, because that was the amount the corporation previously stated it was worth prior to the merger vote.

At trial, both SSM and HMO-W offered expert testimony concerning HMO-W's net value. HMO-W's expert, James Pizzo, testified that the corporation's equity value immediately prior to the merger was $10,544,000. SSM's expert, Patrick Hurst, testified that its value was $19,250,000.

The court accepted Pizzo's valuation of the company. It then held that because SSM owned slightly less than twenty percent of HMO-W's shares, a minority discount must be applied as a matter of law, and it accepted the thirty percent discount proposed by Pizzo.

In a separate decision, the court ordered SSM and the Neillsville Clinic to repay the amount by which HMO-W's payments exceeded the court-determined fair value. The court later entered judgment, declaring that SSM and the Neillsville Clinic were paid $7,459 and $99.56, respectively, more than the amount the court set as the fair value for the shares, and that HMO-W was entitled to recover those amounts, plus twelve percent interest. SSM appeals.

## DISCUSSION

### 1. *Minority Discounts*

Historically, a corporation needed unanimous shareholder approval before it could engage in fundamental transactions, such as merger, consolidation or dissolution, which meant that a single shareholder could veto the entire transaction. *See* Barry M. Wertheimer, *The Purpose of the Shareholders' Appraisal Remedy*, 65 TENN. L. REV. 661, 662 (1998); *see also* Christopher Vaeth, Annotation, *Propriety of Applying Minority Discount to Value of Shares Purchased By Corporation or Its Shareholders From Minority Shareholders*, 13 A.L.R.5th 840, 848–49 (1993). Many viewed this result as unjust and contrary to the common good, particularly in industries where merger and consolidation were necessary in order for the corporation to remain solvent. *See* Wertheimer, *supra*, at 665. As a result, states enacted statutes that permitted fundamental corporate transactions to be made with less than unanimous approval, and that provided shareholders who objected to the transactions with the right to dissent and receive fair value for their shares. *See id.* at 666; *see also* Vaeth, *supra,* at 849. These statutes were primarily intended to "compensate[ ] sharehold-

ers for the loss of the right to veto fundamental transactions" and to "provide[ ] liquidity to shareholders who otherwise would be forced to remain in an investment that they had not chosen." *See* Wertheimer, *supra,* at 668.

Generally, when a shareholder invokes his or her dissenters' rights under the statute, a court must determine the fair value of his or her shares. In valuing the shares, courts will first calculate the pro rata value of the shares and then decide whether to reduce that amount to reflect the shares diminished value. Two common rationales for reducing the value of privately-held corporate stock are: (1) the shareholder's lack of control over corporate decision-making (minority discount); and (2) the stock cannot be freely traded on an organized exchange (lack of marketability discount). *See* Joseph W. Anthony & Karlyn Vegoe Boraas, *Betrayed, Belittled . . . But Triumphant; Claims of Shareholders in Closely Held Corporations*, 22 Wm. Mitchell L. Rev. 1173, 1189–90 (1996). This case involves a minority discount.

Whether a minority discount is permitted under Wisconsin's dissenters' rights statutes is a question of statutory interpretation that we review de novo. *See State v. Setagord*, 211 Wis. 2d 397, 405–06, 565 N.W.2d 506, 509 (1997). The purpose of statutory interpretation is to discern legislative intent. *See Lincoln Sav. Bank, S.A. v. DOR*, 215 Wis. 2d 430, 441, 573 N.W.2d 522, 527 (1998). We first consider the language of the statute. *See id.* If that language clearly and unambiguously sets forth the legislative intent, we will not look beyond it to ascertain legislative intent. *See id.* Instead, we apply the statutory language to the facts of the case. *See id.* If a statute is ambiguous, we look to

the statute's scope, history, context, subject matter and object in order to ascertain legislative intent. *See Setagord*, 211 Wis. 2d at 406, 565 N.W.2d at 510. "A statute is ambiguous when it is capable of being understood in two or more different senses by reasonably well-informed persons." *Id.*

Wisconsin's dissenters' rights statute, § 180.1302(1), STATS., reads in pertinent part as follows:

> (1) Except as provided in sub. (4) and s. 180.1008(3), a shareholder or beneficial shareholder may dissent from, and obtain payment of the fair value of his or her shares in the event of [a merger or other enumerated corporate actions].

The term "fair value" is defined in § 180.1301(4), STATS., as follows:

> "Fair value," with respect to a dissenter's shares other than in a business combination, means the value of the shares immediately before the effectuation of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action unless exclusion would be inequitable. "Fair value," with respect to a dissenter's shares in a business combination, means market value, as defined in s. 180.1130 (9)(a)1. to 4.[1]

---

[1] "Business combination" is defined in § 180.1130(3), STATS., to mean any of the following:

(a) Unless the merger or share exchange is subject to s. 180.1104, does not alter the contract rights of the shares as set forth in the articles of incorporation or does not change or convert in whole or in part the outstanding shares of the resident domestic corporation, a merger or share exchange of the resident domestic corporation or a subsidiary of the resident domestic corporation with any of the following:

1. A significant shareholder.

We conclude that the statutory language is ambiguous as to whether minority discounts should be applied when determining the "fair value" of a dissenter's shares[2] and the legislative history, related statutory provisions,[3] and relevant case law provide no

2. Any other corporation, whether or not itself a significant shareholder, which is, or after the merger or share exchange would be, an affiliate of a significant shareholder that was a significant shareholder before the transaction.

(b) A sale, lease, exchange or other disposition, other than a mortgage or pledge if not made to avoid the requirements of ss. 180.1130 to 180.1134, to a significant shareholder, other than the resident domestic corporation or a subsidiary of the resident domestic corporation, or to an affiliate of the significant shareholder, of all or substantially all of the property and assets, with or without goodwill, of a resident domestic corporation, if not made in the usual and regular course of its business.

Neither party argues that this newly created entity qualifies as a business combination, and based on our reading of the statute, we conclude that it is not.

[2] In transactions involving non-business combinations, there is no ambiguity as to whether the legislature intended the term "fair value" to mean "fair market value." *See* § 180.1301(4), STATS. The statutory language indicates that: (1) the legislature intended business combinations to be valued based on their market value; and (2) the legislature intended business combinations to be valued differently than non-business combinations. We therefore conclude that the legislature did not intend shares of non-business combinations to be valued based on the fair market value.

[3] HMO-W argues that we are to look at the statutory provisions surrounding § 180.1301(4), STATS., for guidance, and that there are several provisions which suggest that the legislature intended for dissenters' shares to be discounted to reflect the shareholder's minority interest. *See* §§ 180.1301(4), 180.1302(4), and 180.1130(14), STATS. Section 180.1302(4), referred to as the "stock market exception," states that holders of publicly-held shares generally do not have dissenters' rights.

823

additional clarification.[4] We therefore turn to other jurisdictions for guidance.

---

Instead, it is assumed that shareholders who oppose the corporate transaction will receive the fair value of their shares by selling them on the open market. And as HMO-W points out, the market takes into account the shareholder's minority interest when valuing the shares. Thus, HMO-W contends that because the legislature intended dissenters in publicly-held corporations to be treated the same as dissenters in closely-held corporations, and shares of publicly-held stock are discounted by the market to reflect minority interest, it is reasonable to conclude that the legislature intended the courts to apply a discount in the privately-held corporate context, as well. HMO-W argues that without this discount, minority shareholders in closely-held corporations would receive a higher value for their shares than minority shareholders in publicly-held corporations. We are not persuaded. The fact that the legislature adopted the stock-market exception is evidence to us that it intended the shareholders in publicly-held corporations to be treated differently than shareholders in privately-held corporations. The other two statutory sections that HMO-W argues have relevance, §§ 180.1301(4) and 180.1130(14), deal with business combinations, and we have already discussed in the previous footnote why the legislature did not intend business and non-business combinations to be valued in the same manner. We therefore decline to infer from these statutory provisions that the legislature intended minority discounts to be applied in both situations.

[4] HMO-W argues that *Copland v. Wisconsin Dep't of Taxation*, 16 Wis. 2d 543, 114 N.W.2d 858 (1962) (affirming assessment of minority discount when determining inheritance tax), *Wisconsin Valley Trust Co. v. Krueger*, 269 Wis. 496, 69 N.W.2d 586 (1955) (same), and *Arneson v. Arneson*, 120 Wis. 2d 236, 355 N.W.2d 16 (Ct. App. 1984) (affirming assessment of minority discount to spouse's corporate shares when dividing the marital estate in divorce action), support the inference that the legislature intended for minority discounts to be used when

Courts are split on this issue. Some states permit minority discounts. *See Hernando Bank v. Huff,* 609 F. Supp. 1124 (N.D. Miss. 1985) (applying Mississippi law), *aff'd,* 796 F.2d 803 (5th Cir. 1986); *Perlman v. Permonite Mfg. Co.,* 568 F. Supp. 222 (N.D. Ind. 1983) (applying Indiana law), *aff'd,* 734 F.2d 1283 (7th Cir. 1984); *Atlantic States Constr., Inc. v. Beavers,* 314 S.E.2d 245 (Ga. Ct. App. 1984); *Stanton v. Republic Bank,* 581 N.E.2d 678 (Ill. 1991); *Moore v. New Ammest, Inc.,* 630 P.2d 167 (Kan. Ct. App. 1981); *King v. F.T.J., Inc.,* 765 S.W.2d 301 (Mo. Ct. App. 1988). Many of these courts concluded that the fair value of a corporation is not simply its net assets divided by the number of outstanding shares. Rather, the value of a share depends upon the degree of control its holder has over fundamental corporate decisions. More control equals greater value; less control equals lesser value. If all shareholders had equal control, then their shares would have equal value. However, because a minority shareholder has less control than a majority shareholder, his or her shares should have a reduced or discounted value.

Several states, however, have held that minority discounts should not be applied. *See Cavalier Oil Corp.*

appraising the fair value of a minority shareholder's privately-held corporate stock. We disagree. None of these cases involve an individual exercising his or her dissenters' rights under the statute. Instead, they involve inheritance tax and domestic relations matters. Under the divorce laws, the legislature sought to ensure equitable division of marital property. Inheritance tax laws serve to raise revenue for the state. Neither of these purposes are consistent with the purpose of the dissenters' rights statutes, which is primarily to protect minority shareholders. We conclude that while these cases are interesting, they are not controlling because of their subject-matter.

*v. Harnett*, 564 A.2d 1137 (Del. 1989); *Weinberger v. UOP, Inc.*, 457 A.2d 701 (Del. 1983); *Richardson v. Palmer Broad. Co.*, 353 N.W.2d 374 (Iowa 1984); *In re Valuation of Common Stock of McLoon Oil Co.*, 565 A.2d 997 (Me. 1989); *MT Properties, Inc. v. CMC Real Estate Corp.*, 481 N.W.2d 383 (Minn. Ct. App. 1992); *Hansen v. 75 Ranch Co.*, 957 P.2d 32 (Mont. 1998); *Rigel Corp. v. Cutchall*, 511 N.W.2d 519 (Neb. 1994); *Friedman v. Beway Realty Corp.*, 661 N.E.2d 972 (N.Y. 1995); *Woolf v. Universal Fidelity Life Ins. Co.*, 849 P.2d 1093 (Okla. Ct. App. 1992); and *Columbia Management Co. v. Wyss*, 765 P.2d 207 (Or. Ct. App. 1988).[5] The rationale for not applying minority discounts is summarized by the following quote:

> Discounting individual share holdings injects into the appraisal process speculation on the various factors which may dictate the marketability of minority shareholdings. More important, to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result.

*Caviler Oil Corp.*, 564 A.2d at 1145.

---

[5] HMO-W points out that while several jurisdictions bar minority discounts in the event of dissolution, some of those jurisdictions have not applied (or have not addressed the issue of) minority discounts in non-dissolution contexts, such as merger or consolidation. As a result, those cases should not be used as support for either position. We agree and have not cited those cases in our analysis.

■

We conclude that minority discounts are inappropriate under dissenters' rights statutes. These statutes were intended to be a trade-off. Majority shareholders were given the power to make fundamental corporate decisions free from minority-shareholder interference and, in exchange, minority shareholders were given the opportunity to receive the appraised fair value of their shares. That appraised fair value should be equal to the shareholder's share of the corporation. It would not be a fair trade-off to require minority shareholders to surrender their veto power in exchange for a discounted return on their investment, while allowing majority shareholders to obtain control over the corporation as well as a premium on their investment. Such a relationship favors one side at the expense of the other, which we conclude is inconsistent with the purpose of the statute. In short, we conclude that each dissenting shareholder should be assigned his or her pro rata share of the corporation's net assets, undiscounted for minority status.[6]

HMO-W contends that we should not consider cases from Oklahoma, Delaware and New York because the dissenters' rights statutes in those states differ considerably from Wisconsin's statute, and therefore are not persuasive. We disagree. While the

[6] HMO-W contends that the valuation should be different if the majority engages in a transaction, which the minority shareholder opposes, in an effort to "squeeze out" that minority shareholder. It argues that the dissenters' rights statute was intended to protect these shareholders, not shareholders like SSM, who choose to exit. We are not persuaded. It is irrelevant whether the shareholder chooses to leave or is indirectly forced out; he or she has the statutory right to receive the undiscounted fair value of his or her shares.

statutory wording may be different, the purpose is the same—to protect minority shareholders.

The Minnesota Court of Appeals, in interpreting a statute similar to our own,[7] has held that minority discounts are inapplicable in the dissenters' rights context. We find its reasoning to be persuasive:

> It is evident this issue involves highly conflicting policy considerations. Either resolution of the issue risks unduly enlarging the value of some shares, either those of the remaining shareholders or those of the dissenter. However, because the legislature has enacted the statute with the evident aim to protect the dissenting shareholder, we must prohibit application of minority discounts when determining "fair value" in statutory dissenter's rights cases in Minnesota.

*MT Properties, Inc.*, 481 N.W.2d at 388. *See also Foy v. Klapmeier*, 992 F.2d 774, 780–81 (8th Cir. 1993) (applying Minnesota law to conclude that minority discounts were inappropriate); *Pooley v. Mankato Iron & Metal, Inc.*, 513 N.W.2d 834, 838 (Minn. Ct. App. 1994).

### 2. *HMO-W's Valuation Representations*

SSM argues that corporate directors have a fiduciary duty to provide corporate shareholders with complete and accurate information regarding the value of the corporation, and that HMO-W breached this duty when it submitted V.R.'s valuation of $16.5 to $18 million to the shareholders prior to the merger vote, and then abandoned that valuation during the

---

[7] Minnesota defines "[f]air value of the shares" to mean "the value of the shares of a corporation immediately before the effective date of the corporate action . . . ." MINN. STAT. § 302A.473(1)(c) (1998).

appraisal process in favor of lower valuations. SSM contends that HMO-W should be held to the $16.5 to 18 million valuation because that was the valuation it apparently endorsed prior to the merger.

SSM cites no authority for such a proposition, and we know of none. More importantly, SSM has not asserted how it has been harmed by HMO-W's abandonment of V.R.'s valuation, other than that it would have received more per share under V.R.'s valuation. However, this is irrelevant because the trial court determines the fair value, not the experts. SSM does not contend that it would have voted any differently on the merger had the $10.5 million valuation been used initially. And because SSM does not explain how the different valuations affected its decision, we see no basis for its argument. We therefore reject it.

### CONCLUSION

We conclude that minority discounts are inappropriate in dissenters' rights cases as a matter of law, and therefore reverse and remand with directions that the circuit court award SSM its pro rata share of HMO-W's net assets without a minority discount. We need not address whether SSM and Neillsville Clinic must repay any amounts to HMO-W, because it is HMO-W that is now the debtor. Finally, we find no merit to SSM's contention that HMO-W is bound by V.R.'s valuation, because the circuit court determines the fair value of a minority shareholder's holdings.

*By the Court.*—Judgment and order affirmed in part; reversed in part and cause remanded with directions.